# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **JESSICA M. PIRAINO,** | ) | |
| **Plaintiff,** | ) | **No. 13 C 5830** |
| | ) | |
| v. | ) | **Magistrate Judge Geraldine Soat Brown** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Jessica Piraino brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the decision of the Commissioner of Social Security denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act, 42 U.S.C. §§ 421, 423. (Compl.) [Dkt 1.][1] Plaintiff moved for summary judgment [dkt 20] and filed a supporting memorandum (Pl.'s Mem.) [dkt 20-1]. The Commissioner filed a cross-motion for summary judgment [dkt 23] with a memorandum in support (Def.'s Mem.) [dkt 24]. Plaintiff replied. (Pl.'s Reply.) [Dkt 26.] The parties consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c). [Dkt 11.] For the reasons set forth below, Plaintiff's motion is granted and the Commissioner's motion is denied.

---

[1] The regulations regarding DIB and SSI are substantially similar and where they do not significantly differ, only one section will be cited. *See Ashpaugh v. Apfel*, No. 98 C 6561, 2000 WL 1222153 at *1 n. 3 (N.D. Ill. Aug. 22, 2000).

1

## PROCEDURAL HISTORY

Plaintiff applied for benefits on August 24, 2009, and the agency denied her claims initially and on reconsideration. (R. 82-85, 92-93, 143.) Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ") (R. 100), and that hearing was held in November 2011 (R. 30-69). On November 29, 2011, the ALJ denied Plaintiff's request for benefits. (R. 11-23.) The Appeals Council declined Plaintiff's request for review (R.1-3), meaning the ALJ's decision is the Commissioner's final decision. *See Villano v. Astrue*, 556 F.3d 558, 561-62 (7th Cir. 2009).

## BACKGROUND

Plaintiff applied for benefits at age 35, alleging that she became unable to work in April 2009 because of severe lower back problems, bursitis, caudal extension, mild bilateral neural foraminal narrowing, manic depression, gall-bladder problems, and anxiety disorder. (R. 143, 172.)[2] In her motion for summary judgment, however, she focuses on her back problems and mental impairments. (*See* Pl.'s Mem. at 2.)

Plaintiff is a high school graduate. (R.37-38.) She previously worked as a unit secretary at a hospital, processing orders and being "the gofer of the floor." (R. 39.) She split her time between sitting and standing. (*Id.*) She assisted with patients when the hospital was short-staffed, including

---

[2] Bursitis is "inflammation of a bursa," which is "a sac or saclike cavity filled with a viscid fluid and situated at places in the tissues at which friction would otherwise develop." *Dorland's Illustrated Medical Dictionary* 262, 264 (32d ed. 2012) [hereinafter *Dorland's*]. Caudal extension relates to pain in the lower back. *See id.* at 308, 1502. "Neural foraminal narrowing occurs when bulging or degenerating discs cause the nerve opening in the spine (known as the 'foramen') to become narrower. This compresses the nerves within the spine and can cause pain, numbness, tingling, and muscle weakness." *Betts v. Astrue*, No. 09 C 7094, 2011 WL 1789822 at *2 n. 6 (N.D. Ill. May 6, 2011) (internal quotations omitted).

lifting them from a wheelchair to a bed. (*Id.*) Plaintiff testified that in October 2007, she had an accident at work that injured her back (R. 53), although the medical records before the court do not go back that far. Plaintiff testified that in March 2009, she again injured her back at work while transferring a patient. (R. 54.) She has not worked since April 2009. (R. 38.) She was terminated from her job in April 2011 for exceeding her medical leave. (R. 38.)

**Medical Evidence**

In February 2008, Plaintiff went to the emergency room because of an allergic reaction to pain medication and was discharged with medication to alleviate the reaction. (R. 244-45.)[3] While there, she also complained of lower back pain and was referred to follow up with Dr. Constantino Perales. (R. 238-39.) A week later, an MRI requested by Dr. Perales showed L5 spondylolysis with L5-S1 spondylolisthesis, with mild degenerative disc disease. (R. 247-48.)[4]

Throughout the rest of 2008, Plaintiff tried various treatments to alleviate her back pain under Dr. Perales's supervision. From March to May 2008, Plaintiff underwent physical therapy and was discharged when she met her therapeutic goals. (R. 284-85.) She restarted therapy, however, in June through August 2008, with renewed complaints of pain, and her therapist recommended continued

---

[3] The medication was Skelaxin, a brand name for metaxalone, which is "a centrally acting skeletal muscle relaxant used in the treatment of painful musculoskeletal conditions." *Dorland's* at 1145, 1723.

[4] Spondylosis is "ankylosis of a vertebral joint," which is "immobility and consolidation of a joint due to disease, injury, or surgical procedure." *Dorland's* at 94, 1754. Spondylolisthesis is "forward displacement (olisthy) of one vertebra over another, usually of the fifth lumbar over the body of the sacrum, or of the fourth lumbar over the fifth, usually due to a developmental defect in the pars interarticularis." *Id.* at 1754. "L5" refers to the fifth of five lumbar vertebra, and "S1" refers to the first of five sacral vertebra; both would generally be considered the lower back. *Id.* at 2050-51.

treatment. (R. 309-10.) In addition, Plaintiff received treatment at a pain clinic, including radiofrequency ablations, a medial branch block, and multiple epidural steroid injections. (R. 340-41, 361, 365-66, 375.)[5] She tolerated these procedures well but they provided only temporary relief. (R. 341, 361, 366, 380.) Dr. Ronald Kloc, who treated Plaintiff at the pain clinic, noted that Plaintiff's pain was likely caused by stress put on her back during her youth when she was very active in gymnastics. (R. 340, 365, 372.)

Around the same time, Plaintiff was experiencing heightened depression and anxiety. In July 2008, police brought Plaintiff to the emergency room for attempted suicide after she made "superficial cuts" on her left wrist. (R. 581.) The admittance form noted "alcohol intoxication major depression." (R. 570.) She was evaluated by the psychiatry unit and diagnosed with "suicidal gesture," and discharged the same day. (R. 571-73.) The attending doctor noted that she had recently been divorced. (R. 572.)

Two months later, in September 2008, Plaintiff was brought to the emergency room again after her former husband called 911. (R. 331-34, 336-38, 607-08, 988-90.) A physician diagnosed Plaintiff with severe, recurrent major depressive disorder and observed that she felt overwhelmed by the divorce and her back treatment, and had recently switched to a new antidepressant. (R. 331-32.) Plaintiff also admitted to increased smoking, alcohol abuse, and cutting herself. (R. 331-33.) Her score on the Global Assessment of Functioning Scale ("GAF score") was only 35 on admittance

---

[5] Radiofrequency ablation involves "the destruction of precisely controlled areas of tissue by heat induced by low-frequency electromagnetic waves." *Dorland's* at 4. A medial branch block is "regional anesthesia of part of the cervical region of the back, produced by injection of a local anesthetic around a medial branch or branches of the posterior branch of a cervical nerve." *Id.* at 227.

but 50 by the time of discharge. (R. 332, 338.)[6] Dr. Perales also evaluated Plaintiff at that time and continued to monitor and treat her anxiety and depression later in 2008. (R. 607, 873.)

In April 2009, around the time of the alleged onset of Plaintiff's disability, Dr. Perales ordered a second MRI of Plaintiff's back. (R. 446.) Comparing the results to the test from a year earlier, the radiologist opined that a "central disc protrusion at the L4-5 level [was] more pronounced than on the prior examination," which leads to "mild bilateral foraminal narrowing." (*Id.*) The radiologist also noted caudal extension and, after reviewing an x-ray, mild scoliosis. (R. 446-47.) Plaintiff then attended a month of physical therapy and made some progress but did not met her goal for decreased pain in her back and legs. (R. 448-49.) The physical therapist reported that Plaintiff had recently fallen down stairs, contributing to the pain in her legs. (R. 448.) In July 2009, Dr. Perales wrote a note saying that Plaintiff "[m]ay not return to work until further notice." (R. 922.)

In August 2009, at Dr. Perales's request, surgeon Christopher Sliva examined Plaintiff. (R. 520-22.) Dr. Sliva opined that Plaintiff had L5-S1 isthmic spondylosis with foraminal stenosis and L4-5 degenerative disk disease with a central disk herniation and radiculopathy. (R. 522.) He also noted the failure of nonoperative treatment. (*Id.*) He concluded that she was "quite disabled because of her symptoms" and was a candidate for lumbar reconstructive fusion surgery. (*Id.*)

Later that month, on August 16, 2009, Plaintiff returned to the emergency room. (R. 1138-40.) According to the attending doctors, a friend of Plaintiff called an ambulance after she threatened to kill herself, stabbed herself multiple times in both legs, took an unknown number of

---

[6] The GAF scale is "a rating of psychiatric status from 1 (lowest level of functioning) to 100 (highest level), assessing psychological, social, and occupational functioning." *Dorland's* at1672.

pills, and became unresponsive. (R. 1146.) She showed up at the hospital severely intoxicated and with bruises all over her body and, after her arrival, became "extremely belligerent" and "had to be in four point restraints." (R. 1138.) One of the attending doctors was Dr. Atul Sheth, who had treated Plaintiff five years earlier for depression. (*Id.*) He assessed a GAF score of 30 and diagnosed intermittent explosive disorder, adjustment disorder with mixed emotional features, bipolar disorder, and borderline personality disorder. (R. 1138-39.) She was hospitalized for three days. (R. 1137-39.)

On August 24, 2009, as a follow up to the emergency-room visit, two social workers examined Plaintiff. (R. 397-415.) They reported that Plaintiff had been sexually assaulted before her overdose. (R. 397.) They also noted that Plaintiff's panic attacks were being controlled with medication but she continued "feeling sad most of the time, crying often, being very irritable with her family, and [having] fleeting suicidal thoughts." (R. 401.) They assessed a GAF score of 49. (R. 415.)[7] The next day, Plaintiff followed up with Dr. Perales, who diagnosed bipolar disorder, nicotine addiction, and chronic lower back pain. (R. 861-62.)

Plaintiff also underwent a gallbladder ultrasound in August 2009 after complaints of gastrointestinal problems, but the test showed nothing unusual. (R. 480.) The next month, she was diagnosed with esphagitis and gastritis and was prescribed medication for reflux disease. (R. 771.)

In September 2009, Dr. Sliva performed spinal fusion surgery on Plaintiff and installed titanium mesh cages into the L4-5 and L5-S1 spaces. (R. 833-36.) Dr. Silva noted that there were no complications. (R. 833-36, 503-04.) After the surgery, Plaintiff began physical therapy and

---

[7] The ALJ stated that Plaintiff's GAF score at this time was 35 but appears to have mistakenly noted Plaintiff's age (written on the same document) as the GAF score. (R. 19, 415.)

reported that her lower back pain was "much improved." (R. 837.) In October, however, Plaintiff complained to Dr. Sliva that she was having sleeping problems caused by pain shooting up her legs, which was new for her, as well as continued back pain. (R. 825.)

Also in October 2009, Plaintiff had a psychiatric evaluation with Dr. Sheth as follow-up to her August hospitalization. (R. 1093-1106.) Dr. Sheth noted that Plaintiff felt good about moving in with her mother and found her prescription for Lamictal, an anticonvulsant, "very helpful." (R. 1093.) She also continued to take two antidepressants (Wellbutrin and Lexapro) and one anti-anxiety medication (Xanax). (R. 1095.) Dr. Sheth noted that Plaintiff had appropriate behavior and thought content, although he also noted a history of thoughts about suicide. (R. 1093, 1097-98.) He diagnosed her as having generalized anxiety, alcohol dependence, and mood disorder. (R. 1101.) He recommended continuing her medications and authorized her to receive medication monitoring and training in a number of topics. (R. 1095, 1100-02.)

In November 2009, Dr. Mark Langgut, a psychologist, evaluated Plaintiff in relation to her claim for disability benefits. (R. 799-801.) He noted that she "walked slowly and appeared to be in significant pain." (R. 799.) She described to Dr. Langgut that sexual trauma she experienced when she was younger manifested as panic attacks when she was 22 years old. (R. 800.) Dr. Langgut diagnosed her with major depressive disorder, anxiety disorder with panic features, and alcohol abuse in remission. (R. 801.) The doctor noted that, when at its worst in the past year, Plaintiff's depression ranked at 10 out of 10. (*Id.*) The doctor additionally observed that Plaintiff reported her depression and anxiety to be at moderate intensity, but that she exhibited normal to rapid speech, excellent coherence, and normal flexibility and suggestibility; no delusions, obsessive ideas, ruminative ideation, or hallucinations; had insight into her own situation; and unimpaired

orientation to time, location, place, and person.  (*Id.*)

In December 2009, Dr. Linda Lanier, a state agency physician, also evaluated Plaintiff's limitations from her mental illness.  (R. 802-19.)  She concluded that Plaintiff had moderate restrictions on activities of daily living, social functioning, interacting with the public and coworkers, and maintaining concentration.  (R. 812, 816-17.)  She noted that Plaintiff had experienced one or two extended episodes of decompensation.  (*Id.* at 812.)  She also found Plaintiff "partially credible" because she did not give consistent information of her drinking history or living situation.  (R. 814.)

In January 2010, Plaintiff followed up with Dr. Silva and complained of continuing pain in her lower back, and the doctor noted that she was noticeably slouching forward to relieve pain.  (R. 823.)  Nonetheless, she had full strength in her lower extremities and reported that she was "still much better than she was prior to surgery" and was "happy with the results of the surgery."  (R. 827.)

That same month, Dr. Calixto Aquino evaluated Plaintiff's medical records related to spinal disc disease on behalf of the state agency.  (R.843-50.)  He concluded that she could lift 20 pounds frequently, ten pounds occasionally, stand or sit six hours in an eight-hour workday, and push and pull without limitation.  (R. 844.)  He also determined that Plaintiff could never crawl or climb ladders, ropes, or scaffolds, but could occasionally climb ramps or stairs, balance, stoop, kneel, and crouch.  (R. 845.)  Dr. Aquino did not mention Plaintiff's mental health issues.

In early February 2010, Plaintiff followed up with Dr. Sheth, who noted that she was "doing well" and her mental health symptoms were "somewhat better."  (R. 1109.)  Plaintiff's back problems persisted, however, because she fell on ice that month and experienced renewed pain.  (R. 882.)  An X-ray of her lumbar spine showed persistent spondylolisthesis at L5-S1 but no acute fracture, dislocation, or bone destruction.  (R. 883.)  She was prescribed a muscle relaxant.  (R.

1031.)

In March 2010, Plaintiff's physical therapist reported to Dr. Sliva that Plaintiff continued to complain of pain in her back and legs and an occasional feeling of buckling in her knees. (R. 1022.) The therapist noted that Plaintiff had a normal gait and could "go up and down stairs with no complaints of change in symptoms." (*Id.*) The therapist performed a straight leg-raising test, which involves the patient lying down and lifting an extended leg, with pain between 30 and 90 degrees of elevation indicating disease of the nerve roots in the lower back.[8] The single leg tests were negative, but Plaintiff complained of "severe pain" when raising both legs to 70 degrees. (*Id.*)

In April 2010, Plaintiff followed up with Dr. Silva, who noted that she "doing very well," had been doing physical therapy, and continued to be happy with the results of her surgery. (R. 1019.) Additionally, Plaintiff's physical therapist noted that she had completed 33 treatment sessions and said that her symptoms were improving. (R. 1021.) Dr. Silva recommended that Plaintiff avoid a job involving significant lifting, twisting, or bending, and that she "would be much better suited to perform some sort of sedentary type work." (R. 1019.) He noted that she had asked about riding a bicycle and predicted that she would be able to do so in six months. (*Id.*) Around this time, Dr. Perales again wrote notes excusing Plaintiff from work until further notice. (R. 1085-87.)

On May 5, 2010, Plaintiff completed a function report describing her limitations. (R. 206-16.) She said that it takes her "10 minutes to log roll out of bed," then 5 to 10 minutes for her legs to feel strong enough to stand. (R. 206.) She said that her father takes her children to school, walks her dog, makes her breakfast, and takes her to appointments, and members of her church clean her house and cook dinner for her and her children. (*Id.*) She wrote that she could not sit or stand for

---

[8] *See Dorland's* at 1571, 1900.

more than 20 minutes at a time, drive more than 15 miles, lay flat, bend to get pants on or tie her shoes, or get into the shower on her own.  (R. 207.)  She said that she was constantly in pain, never gets comfortable, and sometimes forgets to take her anti-anxiety medication leading to "acute pain attacks due to lack of sleep or forgetfulness from the pain."  (R. 207-08.)

On May 11, 2010, Dr. Sumanta Mitra, a state agency physician, examined Plaintiff's medical records related to oesteoarthritis of her spine.  (R. 1055-62.)  Like Dr. Aquino, he concluded that she could lift 20 pounds occasionally, 10 pounds frequently, stand or sit for 6 hours in an 8-hour workday, and push or pull without limitation.  (R. 1056.)  Unlike Dr. Aquino, he found no limitations on Plaintiff's ability to climb, balance, kneel, crouch, or crawl (he agreed that Plaintiff could stoop only occasionally). (R. 1057.)  The same month, Dr. Joseph Mehr reviewed Dr. Lenier's mental health assessment from 2009, and confirmed that recent records had not shown "any significant abnormalities that would prevent the claimant in performing basic unskilled work related activities."  (R. 1054.)[9]

Later in May 2010, Plaintiff visited a gastroenterology specialist with complaints of bloating and constipation likely related to her heavy use of painkillers.  (R. 1071-73.)  It was recommended that she stay on reflux medication, start a high fiber diet, and take miralax daily.  (R. 1073.)  Four days later, police again brought Plaintiff to the emergency room after she overdosed on pills and attempted to cut her wrist.  (R. 1152-67.)

In 2011, Plaintiff regularly followed up with Dr. Sheth about her mental health. In February,

---

[9] The ALJ read Dr. Mehr's opinion as reviewing Dr. Lenier's opinion from December 11, 2009.  (R. 21.)  That appears to be correct, even though Dr. Mehr noted that he reviewed an opinion dated December 11, *2010* (a date after he issued his opinion) and that he modified an opinion dated February 1, 2010 (a date not listed on any opinion in the record).  (R. 1053-54.)

he noted that she was having extreme mood swings, even though her affect was fair, and that she had been self-medicating with alcohol but had not been drinking for in two weeks. (R. 1115.) He noted that her symptoms were "somewhat better." (*Id.*) He noted the same thing in May, but added that she had "poor energy." (R. 1118.) In August, her symptoms were still "somewhat better," but she had become "histrionic and projective," and Dr. Perales had increased her dosage of Xanax. (R. 1122.) In September, Diane Funk, a licensed clinical social worker affiliated with Dr. Sheth, diagnosed Plaintiff with bipolar II, generalized anxiety, panic disorder with agoraphobia, and alcohol dependence, with a GAF score of 48. (R. 1126-27.) In October, Dr. Sheth noted that Plaintiff felt extreme anxiety, was "fearful of leaving her home," and needed to be medicated to attend her son's football games. (R. 1128.) He also remarked that Plaintiff's chronic back pain continued to contribute to her depression and added a prescription for Dekapote, used to treat bipolar disorder. (*Id.*) He suggested a follow up appointment in three months. (R. 1130.)

Shortly before the disability hearing, in October 2011, Dr. Perales wrote a letter in relation to Plaintiff's claim for benefits. (R. 1114.) He said that Ms. Funk and Dr. Sheth, who had treated Plaintiff's mental heath, agreed that she was disabled and unable to return to her job as a secretary at a hospital, although he did not refer to any specific records where they expressed that opinion. (*Id.*) He then stated, "She is in my opinion considered to be totally disabled to work due to these conditions." (*Id.*) Ms. Funk also completed an assessment of Plaintiff's mental residual functional capacity, concluding that she was unable to work and was "markedly limited" in her ability to maintain attention for extended periods, perform activities on schedule, work with others and the public, and make simple work-related decisions, complete a normal work week without psychological interruption, interact with the general public, respond to changes in work setting, and

travel in unfamiliar places or use public transportation.  (R. 1132-34.)

**Hearing before the ALJ**

At her hearing before the ALJ in November 2011, Plaintiff testified that her last employer had terminated her because she exceeded her medical leave.  (R. 38.)  She explained that she originally hurt her back in 2007 during her secretary position.  (R. 53.)  Although she conceded that the fusion surgery "absolutely" reduced some of her pain, she said that the back pain was still "constant" and that she becomes "uncomfortable" after sitting or standing for 20 to 30 minutes.  (R. 42.)  She later clarified that she could probably only stand five minutes before needing to sit down and could walk only about two blocks.  (R. 53.)  She still took pain medication but no longer attended physical therapy.  (R. 43.)  The last time she drank alcohol was two and a half months prior to the hearing.  (*Id.*)

Regarding her mental health, Plaintiff testified that her panic attacks had become "severely worse" in the last seven months, to the point where she was afraid to leave her house, to see or talk to anybody, or to drive.  (R. 44, 46, 53.)  She did attend her son's football games, but it was "very difficult."  (R. 45.)  She stated that she did not have custody of either of her two sons.  (R. 50.)  She said that her medications caused dizziness, fatigue, muscle aches, stomach pain, frequent urination, drops in blood pressure, and dehydration.  (R. 47.)  She explained that she was living by herself, but that her mother would come over to help her with household chores.  (*Id.*)  She said that she could not focus enough to read and spent her time "spacing out watching TV," unless it was one of her "depression days," in which case she would not shower or eat but "would just shut the shades and stay in bed and cry most of the day."  (R. 48, 51.)  She said that her depression days increased in

frequency during the past year from five or six times per month to 12 to 15 times per month. (R. 51.)

After Plaintiff's testimony, her ex-husband testified to his experience with her medical conditions. (R. 58-63.) He said that she had changed as a person from being outgoing and optimistic to being withdrawn and needing help to drive and take care of her children. (R. 59-61.) He agreed that there are days when Plaintiff will not shower or answer the phone and that she cannot sit to complete a task for more than half an hour. (R. 62.)

Finally, the ALJ asked a vocational expert ("VE") a series of questions about Plaintiff's potential for employment. (R. 63-67.) One of the ALJ's hypotheticals described a person who could perform only sedentary work, with the additional limitations of no crawling or climbing of ladders, ropes, or scaffolding; only occasional stooping, kneeling, balancing, crouching, and climbing of ramps and stairs; only simple instructions and work-related decisions; only routine tasks; occasional interactions with supervisors and coworkers; and no interaction with the public. (R. 65-67.) The VE testified that such a person could not perform Plaintiff's past work, but could work as a circuit-board assembler, document preparer, or medical eye drop assembler. (R. 67.)[10] The VE added, however, that Plaintiff would be precluded from all work if she missed three days of work per month or would be off task 30 percent of the time. (*Id.*)

### Disability Determination Process

Under the Social Security Act, disability is defined as the "inability to engage in any

___

[10] The VE mistakenly cited Dictionary of Occupational Titles entry 737.687-086 as defining the position of medical eye drop assembler. (R. 67.) That entry actually defines the position of "mercury-cracking tester." The ALJ cited the VE's testimony as "eye drop assistant." (R. 23.) The court has not found any definition for the position of medical eye drop assistant or assembler.

substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The regulations prescribe a five-part sequential test for determining whether a claimant is disabled. *See* 20 C.F.R. § 404.1520. Under the regulations, the Commissioner must consider the following: (1) whether the claimant has performed any substantial gainful activity during the period for which she claims disability; (2) if she has not performed any substantial gainful activity, whether the claimant has a severe impairment or combination of impairments; (3) if the claimant has a severe impairment, whether the claimant's impairment meets or equals any impairment listed in the regulations as being so severe and of such duration as to preclude substantial gainful activity; (4) if the impairment does not meet or equal a listed impairment, whether the claimant retains the residual functional capacity ("RFC") to perform her past relevant work; and (5) if the claimant cannot perform her past relevant work, whether she is unable to perform any other work existing in significant numbers in the national economy. *Id.*; *Zurawski v. Halter*, 245 F.3d 881, 885 (7th Cir. 2001). An affirmative answer at steps one, two or four leads to the next step. *Zurawski*, 245 F.3d at 886. An affirmative answer at steps three or five requires a finding of disability, whereas a negative answer at any step other than step three precludes a finding of disability. *Id*. The claimant bears the burden of proof at steps one to four, and if that burden is met, at step five the burden shifts to the Commissioner to provide evidence that other work that the claimant can perform exists in significant numbers in the national economy. 20 C.F.R. § 404.1560(c)(2); *Zurawski*, 245 F.3d at 886.

**The ALJ's Decision**

In concluding that Plaintiff was not disabled, the ALJ found, at step one, that she had not engaged in any substantial gainful activity since April 27, 2009.  (R. 13.)  At step two, the ALJ concluded that Plaintiff had five severe impairments: depression, anxiety, alcohol dependence, back impairment, and bipolar disorder.  (*Id.*)  At step three, the ALJ found that none of those impairments met or equaled the severity of any disability listing.  (R. 14.)  The ALJ specifically explained that Plaintiff did not meet the criteria for listing 1.04, for disorders of the spine, or paragraphs B or C of listings 12.04 and 12.06, for affective and anxiety-related disorders.  (R. 14-15.)

At steps four and five, the ALJ determined that Plaintiff, who is a high school graduate, was unable to perform any of her past work but would be able to perform the job requirements of a circuit board assembler, document preparer, or medical eye drop assistant, and thus was not disabled.  (R. 22-23.)  In reaching that conclusion, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform sedentary work (*see* 20 C.F.R. 404.1567(a) and 416.967(a)), but with the additional limitations of no climbing of ladders, ropes, or scaffolds; no crawling; only occasional climbing of ramps and stairs, balancing, stooping, kneeling, and crouching; only simple instructions, routine tasks, and simple work-related decisions; only occasional interaction with supervisors and coworkers; and no interaction with the public. (R. 15.)[11]

The ALJ did not find Plaintiff's own assessment of her limitations to be credible.  The ALJ explained that Dr. Silva's notes indicate that Plaintiff did well following her surgery and could

---

[11] According to federal regulation, "[s]edentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  20 C.F.R. § 404.1567.

perform some form of sedentary work. (R. 20.) As to Plaintiff's mental health, the ALJ noted that Plaintiff did not receive outpatient mental health treatment until 2011, even though she "was hospitalized a few times" before that. (*Id.*) The ALJ also said that Plaintiff's medical record indicate no side effects from medications and, citing Dr. Sheth's notes, that there was a question about her abuse of alcohol as recently as October 2011. (*Id.*) Further, the ALJ decided that, although medical records confirmed Plaintiff's testimony that her anxiety had worsened in the past year, there was no evidence that the worsening would last 12 months, especially since Dr. Sheth had noted that her symptoms were somewhat better. (R. 20-21.)

The ALJ stated that the assessed RFC was consistent with Dr. Sliva's opinion from 2010 that Plaintiff would be better suited for sedentary work without significant lifting, twisting, or bending. (R. 21.) The ALJ observed that Dr. Aquino and Dr. Mitra, state-agency doctors, had opined that Plaintiff could perform light work. (*Id.*) The ALJ did not assign a weight to those opinions, but said that the evidence, when viewed in the light most favorable to Plaintiff, supported additional limitations. (*Id.*) The ALJ gave "some weight" to the opinions of Dr. Lenier and Dr. Mehr, who concluded that Plaintiff had moderate restrictions on daily living, social functioning, concentration, persistence, pace, and could perform unskilled work. (*Id.*) The ALJ again emphasized, however, that she had imposed greater limitations than those opinions supported. (*Id.*) The ALJ gave no weight to Dr. Perales's letter, explaining that the opinion addressed "an issue reserved to the Commissioner, and moreover, it is not supported by the objective medical evidence." (*Id.*) Finally, the ALJ similarly gave no weight to Ms. Funk's assessment because her notes were not provided, she was "not an acceptable medical source," and her opinion was inconsistent with the medical evidence. (*Id.*)

## STANDARD OF REVIEW

The Social Security Act provides for limited judicial review of a final decision of the Commissioner. *See* 42 U.S.C. § 405(g). Where the Appeals Council declines a requested review of an ALJ's decision, it constitutes the Commissioner's final decision. *Villano*, 556 F.3d at 561-62. While an ALJ's legal conclusions are reviewed *de novo*, the ALJ's factual determinations are reviewed deferentially and are affirmed if they are supported by substantial evidence in the record. *Jones v. Astrue,* 623 F.3d 1155, 1160 (7th Cir. 2010); *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Evidence is substantial if it is sufficient for a reasonable person to accept it as adequate to support the decision. *Jones*, 623 F.3d at 1160; *Craft*, 539 F.3d at 673. "Although this standard is generous, it is not entirely uncritical," and the case must be remanded if the decision lacks evidentiary support. *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002) (citation omitted).

When evaluating a disability claim, the ALJ must consider all relevant evidence and may not select and discuss only the evidence that favors her ultimate conclusion. *See Murphy v. Astrue*, 496 F.3d 630, 634-35 (7th Cir. 2007); *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). Although the ALJ is not required to discuss every piece of evidence, the ALJ must provide an accurate and logical bridge between the evidence and the conclusion, so that a reviewing court may assess the validity of the agency's ultimate findings and afford the claimant meaningful judicial review. *Craft*, 539 F.3d at 673. "If the Commissioner's decision lacks adequate discussion of the issues, it will be remanded." *Villano*, 556 F.3d at 562.

**DISCUSSION**

**1.    Dr. Perales' opinion**

Plaintiff first faults the ALJ for not giving controlling weight to the opinion of Dr. Perales, Plaintiff's primary treating physician.  (Pl.'s Mem. at 11-12.)  "A treating physician's opinion is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence. " *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) (internal quotations omitted).  If the ALJ does not give the opinion controlling weight, the ALJ must evaluate the weight to give to the opinion according to the factors set out in 20 C.F.R. § 404.1527(c).  The ALJ must give good reasons for the weight that it assigns a treating physician's opinion. *Id.*; *Roddy v. Astrue*, 705 F.3d 631, 636-37 (7th Cir. 2013); *Bates v. Colvin*, 736 F.3d 1093, 1101 (7th Cir. 2013).

The ALJ did not analyze Dr. Perales's note, including the doctor's remark that Plaintiff "is in my opinion considered to be totally disabled to work," (R. 1114), using the factors set out in §404.1527.  Instead, the ALJ provided only two reasons for giving "no weight" to the opinion: in her view, "it is on an issue reserved to the Commissioner, and moreover, it is not supported by the objective medical evidence."  (R. 21.)

Although the ALJ is not bound by the treating doctor's opinion on the issue of whether the claimant is disabled, the ALJ cannot simply dismiss a treating doctor's opinion on the ground that determining disability is reserved to the ALJ.  "[W]hether the applicant is sufficiently disabled to qualify for social security disability benefits is a question of law that can't be answered by a physician.  But the answer to the question depends on the applicant's physical and mental ability to

work full time, and that is something to which medical testimony is relevant and if presented can't be ignored." *Garcia v. Colvin*, 741 F.3d 758, 760 (7th Cir. 2013)(citing *Bjornson v. Astrue*, 671 F.3d 640, 647-48 (7th Cir. 2012); *Ferguson v. Comm'r of Social Security*, 628 F.3d 269, 272-73 (6th Cir. 2010)).[12]

The ALJ's second justification for rejecting Dr. Perales's opinion—that it is inconsistent with the objective medical evidence—is difficult to evaluate because the ALJ cited no specific evidence to support her view. (R. 21.) Although the state agency doctors came to a different conclusion about Plaintiff's condition, generally more weight is given to examining sources than nonexamining, especially when, as here, a physician treated a claimant regularly for a number of years. *See* 20 C.F.R. § 404.1527(c)(1)-(2). Dr. Silva remarked that Plaintiff would be "much better suited to perform some sort of sedentary type work," but it is reading a lot into that note to suggest it is an opinion that Plaintiff is, in fact, able to do sedentary work. (R. 1019.) Rather, Dr. Silva was opining that Plaintiff could not do her previous work. (*Id.*) Also, Dr. Silva is a spine surgeon and his opinion never mentions Plaintiff's mental illness. (*Id.* at 912, 1019.) In contrast, Dr. Perales specializes in family practice, (R. 1010), and treated both Plaintiff's back and mental-health problems concurrently. In addition to overseeing initial treatments on Plaintiff's back pain and

---

[12] The Commissioner seeks to undermine the value of Dr. Perales's opinion with four arguments. (Def.'s Mem. at 4-6.) First, the Commissioner contends that the doctor's opinion is "second-hand" because it merely adopts the opinions of Dr. Sheth and Ms. Funk. (*Id.* at 4.) Second, the Commissioner argues that Dr. Perales opined outside his expertise in regard to Plaintiff's mental illness. (*Id.* at 5.) Third, the Commissioner insists that Dr. Perales only addressed Plaintiff's ability to perform her past work, not any work. (*Id.* at 5-6.) Finally, the Commissioner defends the ALJ's decision as crediting the opinion of Dr. Silva, a treating surgeon, over that of Dr. Perales. (*Id.* at 4.) However, the court cannot consider reasons that the ALJ did not express. *See Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014) (citing, *inter alia*, *SEC v. Chenery Corp.*, 318 U.S. 80, 87-88 (1943).

referring her to Dr. Silva for surgery, Dr. Perales followed up on her hospitalizations in 2008, diagnosed her with bipolar disorder in 2009, and increased her dosage of anti-anxiety medication in 2011. (*See* R. 248, 520, 607, 861-62, 873, 1022.)

Of the medical opinions in the record, Dr. Perales's opinion is the only one from a treating physician opining on Plaintiff's ability to work in light of the combination of her back pain and mental health.[13] That fact is important because the record repeatedly suggests that Plaintiff's chronic pain aggravated her mental illness (*see* R. 331, 397, 1128), and the ALJ was required to analyze Plaintiff's impairments in combination. *See Williams v. Colvin*, 757 F.3d 610, 613 (7th Cir. 2014); *Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2012); *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009). Moreover, as a rule, the more knowledge a treating physician has about a claimant's impairments, the more weight an ALJ must give to the physician's opinion. *See* 20 C.F.R. § 404.1527(c)(2)(ii). The ALJ, however, did not discuss Dr. Perales's superior position to assess Plaintiff's limitations in combination over the extended period of time Dr. Perales has treated Plaintiff. S*ee* § 404.1527 (c)(2) (stating that treating sources are most able to provide a detailed, longitudinal picture of the claimant's impairments). Accordingly, the ALJ did not build the necessary logical bridge to support her rejection of Dr. Perales's opinion. If Dr. Perales's conclusion that Plaintiff was totally disabled is given some weight, it would also bolster her credibility and possibly affect her RFC. For that reason, the ALJ's rejection of Dr. Perales's opinion warrants remand.

---

[13] According to Dr. Perales's letter, Dr. Sheth also concluded that Plaintiff is totally disabled. (R. 1114.) Neither party, however, cites any document recording Dr. Sheth's opinion.

## 2.     RFC Assessment

Plaintiff next contends that the ALJ failed to consider the combination of her back pain with her history as a gymnast, arguing that this history predisposed her to degenerative disc disease, as shown by the MRIs of her back before her surgery.  (Pl.'s Mem. at 12-13; *see* R. 247, 522.)  Plaintiff cites *Roddy v. Astrue*, 705 F.3d 631, 637 (7th Cir. 2013), in which the court explained that "[t]he term 'degenerative' implies that [a claimant] suffers from a condition that will get worse over time, especially without proper treatment; it is not one that will remain stable or improve."

That argument is not persuasive here.  The reference to "degenerative disc disease," which is in the MRI report that was done before Plaintiff's surgery, must be taken with the entire medical record, including records that show that Plaintiff's back condition improved in some ways following her surgery.  (R. 20.)  The ALJ was not required to fashion additional limitations based solely on the fact that Plaintiff's condition had been called degenerative.

Furthermore, Plaintiff's argument that her previous career as a gymnast and dancer "clearly predisposes her for a more severe degenerative disc disease than someone who has not put their body through so much" (Pl.'s Mem. at 12), is not supported by any citation to the medical record.  The ALJ may not speculate what effect Plaintiff's previous activity as a gymnast might have on her medical condition.

## 3.     Plaintiff's ability to work

Plaintiff also argues that the ALJ erred in assessing her RFC in regard to her depressive episodes.  (Pl.'s Mem. at 13.)  Plaintiff points to the VE's testimony that missing three days of work per month would render Plaintiff disabled, in light of her own testimony about having "depression

days" 12 to 15 times per month and her ex-husband's testimony that Plaintiff experienced days when "she's completely out of it" and will sleep all day and not shower or answer her phone.  (R. 51, 62, 67.)

The ALJ's decision on this point is indeed troubling.  The ALJ recognized that Plaintiff had recently complained of increased anxiety, but explained that "there is no evidence this worsening is going to last 12 months."  (R. 20-21.)  The opposite, however, was also true.  No doctor had opined that Plaintiff's mental health would improve in the next year.  In fact, Plaintiff's mental illness had landed her in the emergency room four times in two years.  Although Dr. Sheth found that Plaintiff symptoms were "somewhat better" in 2011, he also explained that she remained "histrionic and projective" and reported "extreme mood swings" and "extreme anxiety" that was inhibiting her from leaving her house.  (R. 1122, 1128.)  Moreover, Dr. Sheth continued to adjust Plaintiff's prescriptions as late as October 2011, and she testified at her hearing that her doctors had "been switching [her] meds around trying to find something . . . that might be more effective."  (R. 46-47, 1128.)  All this undermines the ALJ's suggestion that Plaintiff's condition had stabilized.

On remand, the ALJ should reconsider her conclusion that Plaintiff will not miss three days of work per month in light of Dr. Sheth's treatment notes from 2011.[14]

## 4. Listings

Finally, Plaintiff contends that the ALJ erred at Step 3 by concluding that her conditions did not meet or equal the impairments in listing 1.04(A) or paragraph B of listings 12.04 and 12.06.

---

[14]  As noted (n. 10 *supra*), the VE's testimony included opining that Plaintiff could perform work as a "medical eye drop assembler," which appears to be in error because the VE and ALJ cited to the entry for "mercury-cracking tester."  That should be clarified on remand.

(Pl.'s Mem. at 13-15.) "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). As Plaintiff emphasizes, the ALJ, in considering whether a claimant's conditions matches a listing, must "'offer more than a perfunctory analysis of the listing.'" *Kastner v. Astrue*, 697 F.3d 642, 647 (7th Cir. 2012) (quoting *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir.2004).)

Plaintiff first addresses listing 1.04(A), which covers disorders of the spine "resulting in compromise of a nerve root . . . or the spinal cord," with: "(A) Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss . . . accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or (B) Spinal arachnoiditis . . . ; or (C) Lumbar spinal stenosis . . . . " The ALJ's decision simply repeats the elements of the listing and states, without analysis, that Plaintiff does not meet them. (R. 14.)

The ALJ's analysis was not sufficient, especially since, as Plaintiff notes, there was MRI evidence showing she suffered from nerve compression. (R. 446-47.) The Commissioner points out that Plaintiff's fusion surgery in September 2009 was intended to alleviate her nerve impingement, and that Dr. Silva noted after surgery that she had full strength in her lower extremities. (Def.'s Mem. at 9.) But the ALJ did not mention that evidence in analyzing the listing, nor did she discuss the evidence that, after surgery, an X-ray showed persistent spondylolisthesis and Plaintiff still walked with a slouch to relieve pain and complained of buckling in her knees. (R. 14, 823, 882-83, 1022.) Moreover, the ALJ never mentioned that Plaintiff reported pain during a bilateral straight-leg raising test in March 2010. (R. 1022.) Thus, the ALJ's analysis of listing 1.04(A) was too

23

perfunctory to stand. *See Kastner*, 697 F.3d at 647-48 (remanding when ALJ cited only one piece of evidence in her analysis of listing 1.04(A) and overlooked evidence that Plaintiff had a limited range of motion); *Smith v. Astrue*, No. 09 C 6210, 2011 WL 722539 at *11-12 (N.D. Ill. Feb. 22, 2011) (remanding when ALJ failed to mention EMG evidence of contradicting xrays and MRIs in discussing listing 1.04(A)).

Plaintiff then challenges the ALJ's decision that she did not meet paragraph B of listings 12.04 and 12.06, which covers mental illness that results in at least two of the following:

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration.

Plaintiff emphasizes that she was often assessed with low GAF scores, that Dr. Langgut found she had impaired sleep and few regular activities, and that she herself has stated she has significant difficulties getting out of bed in the morning because of her pain. (Pl.'s Mem. at 14-15, citing R. 800.)

The Commissioner's arguments in response are persuasive. (Def.'s Mem. at 10-12.) First, the Commissioner points out that Plaintiff is improperly conflating her physical pain with a "marked" restriction resulting from her mental illness. (*Id.* at 10.) Second, the Commissioner notes that Dr. Langgut's opinion is not very helpful to Plaintiff. (*Id.* at 11.) The doctor concluded that she could perform her activities of daily living, had "a good social support network," had anxiety and depression of only "moderate intensity," had intact memory skills and judgment, showed no signs of delusions or obsessive ideas, and "had thought processes [that] were characterized by normal to rapid speed, excellent coherence, and normal flexibility and suggestibility." (R. 800-01.) Finally,

24

the Commissioner notes that an ALJ is not required to determine the extent of a claimant's disability based entirely on GAF scores, which may be assessed without explanation. *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010).

The court agrees with the Commissioner that Plaintiff's motion for summary judgment fails to undermine the ALJ's conclusion on this issue. The court expresses no opinion, however, on whether Plaintiff might be able to show on remand that her conditions meet or equal listing 12.04 or 12.06, and the ALJ remains free to revisit her ruling on that point, or any other, in light of the Plaintiff's arguments in the motion for summary judgment and the ALJ's errors, as discussed in this opinion, related to Dr. Perales, Plaintiff's ability to work, and listing 1.04(A).

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment [dkt 20] is granted, and the Commissioner's cross-motion for summary judgment is denied [dkt 23]. The case is remanded pursuant to 42 U.S.C. § 405(g) for further proceedings consistent with this opinion. Judgment is entered for the Plaintiff and against the Commissioner.

_____
Geraldine Soat Brown
United States Magistrate Judge

Date: June 15, 2015